Filed 11/7/25  Jayden A.G. v. Lincoln Unified School District CA3

### NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| JAYDEN A.G., a Minor, etc.,<br><br>  Plaintiff and Appellant,<br><br>  v.<br><br>LINCOLN UNIFIED SCHOOL DISTRICT et al.,<br><br>  Defendants and Respondents. | C096920<br><br>(Super. Ct. No. STKCVUNPI20180005509) |

Plaintiff Jayden Galbert, through his mother and guardian ad litem Shynelle Jones, brought a personal injury action against defendants Lincoln Unified School District, its superintendent, the principal of Lincoln High School, and a football coach at the school. In August 2017, when he was 13 years old, Galbert participated in the school's football tryouts on a day when the temperature exceeded 100 degrees.  At the end of the tryouts, Galbert collapsed and was later hospitalized and treated for exertional heatstroke. Galbert sued defendants, alleging that he suffered permanent partial disabilities as a result.  After years of litigation, Galbert proceeded to trial on a single cause of action that

1

his complaint pleaded as "Reckless/Gross Negligence (CACI 425)." (Some capitalization omitted.) The jury found defendants not liable.

Galbert, who is no longer a minor, appeals, contending primarily that the trial court erred in construing the operative complaint as alleging only "gross" negligence, not "ordinary" negligence, and requiring him to prove that heightened form of negligence.[1] He additionally argues that the trial court misinstructed the jury that certain guidance and policy documents did not establish a "mandatory duty" or "mandatory standard of care," which error he contends was exacerbated by the court's sustaining of a witness's assertions of an unspecified "privilege" in connection with the witness's invocation of his Fifth Amendment right against self-incrimination. Galbert also claims that the trial court erred in failing to exclude statements that methamphetamine was in his system on the date of the incident when it undisputedly was not. And he argues that these asserted errors, when viewed together, were cumulatively prejudicial, warranting a new trial.

Finding no grounds for reversal in any of these claims, either individually or collectively, we affirm.

BACKGROUND

The following events, as described in the trial testimony, gave rise to Galbert's suit. On August 1, 2017, Galbert participated in tryouts for the freshman football team at Lincoln High School in Stockton, where he was about to start high school. The week before, the National Weather Service had issued an excessive heat watch, warning of widespread triple-digit temperatures across central California, including Stockton, over the following week. Area heat advisories issued on July 31st and August 1st warned of highs between 98 and 108 degrees in locations at Stockton's elevation and advised staying hydrated, staying out of the sun, and rescheduling strenuous activities to the morning or evening. The advisories also warned of the possibility of heat-related

_____

[1] We refer to filings made by Galbert through his guardian ad litem as filings by Galbert.

2

illnesses. The school's athletic director and defendant John James, the coach of the freshman football team, were aware that it would be hot but did not modify or reschedule the tryouts.

Several days before the tryouts, Galbert was prescribed Adderall. Galbert took the medication on the days leading up to the tryouts, including on the morning of August 1, 2017.

On August 1st, the temperature near Lincoln High School reached at least 101 degrees. The tryouts that day started at 2:30 p.m. on an Astroturf field, which was hotter than a grass field. The players participated in various drills with no contact, no pads, and no helmets. Around 3:30 or 4:00 p.m., they walked to a practice field at a nearby middle school. There, they walked through plays for some time, during which Galbert was standing to the side, and then finished with conditioning. Coach James testified that the players ran 100 yards six times, with short breaks in between. Galbert testified that they ran 100 yards ten times, running each as fast as they could.

Around 4:10 p.m. or later, the players gathered in front of James, each on one knee, for a closing huddle. James testified that, during the huddle, Galbert's head dropped, he went limp, and then "he kind of rolled over" onto his back. James recalled that Galbert got back up as soon as he went to check on him, saying he was okay, just hot. In a video-recorded deposition played for the jury, one of the other players testified that Galbert had "passed out" for more than two minutes. James disagreed with that testimony and stated that he did not believe Galbert ever lost consciousness. James and another player walked Galbert over to sit on a bucket in the shade and poured water on him because he said he was hot.

Galbert called his grandmother to explain where to come to pick him up. James testified that Galbert was speaking normally to her but she was not understanding where he was located, so James took the phone and spoke with her. According to James, he told Galbert's grandmother that Galbert had fallen over and said he was hot. James explained

the pickup location to her.  Galbert's grandmother relayed the information to a family friend who was scheduled to pick up her grandson.

James recalled Galbert again saying he was fine, "just hot."  James and the athletic director testified that the ambient temperature was over 100 degrees at the time of Galbert's collapse.  Galbert's climate expert testified that, during the tryouts, players likely would have experienced a heat index of over 100 degrees and, at the time of Galbert's collapse, an index of over 109 degrees.

After calling his grandmother, Galbert took a large drink of water and then vomited.  A few minutes later, the family friend arrived, and, according to James's testimony, James described what had happened and suggested that the friend take Galbert to the hospital as a precaution.  At James's suggestion, the friend drove his van onto the field, and Galbert "crawled" in.  After they left, James called Galbert's mother and told her what had happened.  According to James, he suggested that Galbert be taken to the hospital; but according to Galbert's mother, James did not suggest that or convey any sense of emergency until he called her a second time and suggested taking him to urgent care.

Later that evening, Galbert was taken to a local hospital by ambulance because he was hyperventilating, speaking in a childlike manner, and could not focus his vision.  He was later airlifted to another hospital, where he was diagnosed with heatstroke and treated in the intensive care unit for a few days.

Galbert filed suit in May 2018.  Pretrial litigation continued for four years, with Galbert asserting variously styled causes of action for gross negligence across four successive complaints.  After the trial court denied defendants' motion for summary judgment, the case proceeded to trial, and in May 2022, a divided jury found defendants

were not grossly negligent. After an unsuccessful motion for a new trial, Galbert filed this timely appeal from the judgment entered in favor of defendants.[2]

## DISCUSSION

### I.

Galbert's principal contention on appeal is that the trial court erred in construing his complaint as alleging only a cause of action for gross negligence, not ordinary negligence, and by preventing him at various stages of the litigation from pursuing a theory of ordinary negligence.

### A.

In November 2017, Galbert's counsel presented the District with a timely tort claim under the Government Claims Act (Gov. Code, § 810 et seq.). The District responded, through counsel, asserting (among other things) that, before the tryouts, Galbert's mother had signed a liability waiver, which it viewed as providing for the assumption of all risks associated with participation in football and releasing the District and its employees from liability.

In April 2018, Galbert's counsel served the District with an application for leave to present a late claim (Gov. Code, § 911.4) to allege "gross negligence, failure to follow standard guidelines, and . . . that the [waiver] is void." The application and an accompanying declaration explained that the reason the original claim did not allege gross negligence was that Galbert's mother had forgotten she had signed the liability waiver, and counsel was previously unaware of it.

---

[2] We reject defendants' argument that Galbert forfeited the entirety of this appeal by filing an opening brief that presents the facts in a light most favorable to him, rather than providing the complete summary of significant facts required by rule 8.204(a)(2)(C) of the California Rules of Court. To the extent minor portions of the record were described without acknowledging conflicting evidence, our resolution of this appeal does not turn on those facts, and we decline to adopt the harsh sanction that defendants request.

The next month, Galbert initiated this action against defendants. His original complaint asserted two causes of action, one for "Gross Negligence" and another for "Negligent Misrepresentation Constituting Deceit." (Some capitalization omitted.) The complaint alleged that Galbert collapsed due to heat exhaustion and dehydration after being denied water at the football tryouts. Under the "Gross Negligence" cause of action, Galbert alleged that "totally ignoring" best practices guidelines regarding proper hydration and heat exhaustion "constitute[d] gross negligence" and that defendants "demonstrated [an] extreme departure from what a reasonably careful person would do in the same situation . . . , constituting gross negligence . . . ."

In January 2019, Galbert filed a first amended complaint asserting six causes of action, including, as relevant here, a cause of action for "Reckless and Gross Negligence [CACI 425]" and another for "Reckless and Gross Negligence Per Se [CCP § 669]." In September 2019, after substantial motion practice, including multiple discovery motions by both sides, Galbert filed a second amended complaint reasserting identically labeled causes of action.[3]

Further motion practice followed, and the case was set for a November 2020 trial. In March 2020, Galbert filed the operative third amended complaint, this time alleging a single cause of action for "Reckless/Gross Negligence (CACI 425)." (Some capitalization omitted.) The third amended complaint repeatedly referred to defendants' "gross negligence" and, specifically, their alleged "gross negligence as defined in California Civil Jury Instruction # 425." In their answer to the third amended complaint, defendants asserted various affirmative defenses, including express assumption of risk and release of all claims due to the waiver. Another round of motion practice followed, during which the trial date was continued to July 2021.

---

[3] The appellate record does not include copies of either the first amended complaint or the second amended complaint. We quote the titles of the causes of action as reflected in the trial court's ruling on Galbert's motion for a new trial.

In April 2021, defendants moved for summary judgment, arguing that the waiver was valid and covered the injuries at issue, and that, although a liability waiver cannot release liability for gross negligence in a sports context (*City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 750-751 (*Santa Barbara*)), defendants were not grossly negligent.  In his opposition, Galbert argued that the District "ha[d] not been released from liability for the negligent conduct of its football coach" and that there were triable issues as to whether defendants "were grossly negligent."  In their reply papers, defendants argued, inter alia, that "[t]he issue on this motion is exceedingly simple:  there is no triable issue of fact establishing **gross** negligence on the part of any Defendant."

In August 2021, the trial court issued a detailed minute order addressing defendants' motion for summary judgment.  The ruling began by stating:  "This case is a claim for 'gross negligence' only—nothing more and nothing less.  Plaintiff's Third Amended Complaint . . . just alleges one cause of action for gross negligence against all Defendants. . . ."  The court noted that among defendants' several arguments was a claim that any negligence by defendants was immunized by the liability waiver signed by Galbert's mother.  The court concluded that the argument "simply is not applicable to this case," "[b]ecause the only cause of action alleged in [the complaint] was gross negligence," and "gross negligence is exempt from waivers of liability."  With respect to that claim, the court determined that Galbert had submitted sufficient evidence to create triable issues of material fact as to whether defendants' conduct amounted to gross negligence.  The court thus denied defendants' motion for summary judgment.

During the pendency of the summary judgment motion, the trial date was continued two additional times:  first to September 2021 and then to March 2022.  In early February 2022, the trial date was continued once more, to April 2022, at Galbert's request.

In mid-February 2022, Galbert filed a motion to bifurcate the issue of the waiver's validity and a motion for leave to file a fourth amended complaint.  Galbert argued that

7

bifurcation was necessary so that the court could determine before trial whether the jury would have to find defendants grossly negligent or whether a finding of ordinary negligence would suffice to establish liability. The motion also advised that Galbert was concurrently moving to amend the complaint to expressly allege a cause of action for ordinary negligence. In his motion to amend, Galbert sought leave to file a fourth amended complaint adding a cause of action for ordinary negligence based on the identical factual allegations in the operative third amended complaint. Galbert explained that if the waiver were found invalid, then he would "proceed to trial on the negligence cause of action," and if the waiver were found valid, he would "proceed on the gross negligence cause of action." In an accompanying declaration, Galbert's counsel stated that the third amended complaint asserted "only gross negligence" and that the motion to amend was filed alongside the motion to bifurcate so that the issue of the waiver's validity would not be viewed as moot.

After receiving defendants' oppositions, the trial court denied both motions. With respect to the motion for leave to amend, the court found that "there was unwarranted delay in seeking leave to amend and no excuse for the delay." The court also found that allowing the amendment would prejudice defendants. The court denied the motion to bifurcate as moot.

The case proceeded to a multi-week trial over April and May 2022. Galbert again asked the trial court, including through a motion in limine, to adjudicate the validity of the waiver and to permit him to argue a theory of ordinary negligence if the waiver was found invalid. At a hearing, the court expressed concern that Galbert's motion was an attempt to relitigate his earlier motion to amend, which the court said it had denied "because [he] wanted to add an entirely new cause of action" after more than four years. The court again declined to rule on the waiver's validity, reasoning that it was "irrelevant."

8

Roughly midway through trial and again at the close of evidence, Galbert's counsel filed briefs again asking the trial court to invalidate the waiver. During a discussion of jury instructions, Galbert's counsel argued that the reason they "had to use gross negligence forever was because of . . . all of the pending papers on waiver and release and all of that where it would have been thrown out of court if he didn't plead gross negligence." The trial court asked if it was correct in its understanding that Galbert's counsel had "dropped" the negligence cause of action because of mounting pretrial motions, only to "resurrect it" at trial just before the jury's deliberations. Counsel responded that "to stop the demurrers we filed this Complaint so that we could at least concentrate on the barrage of discovery." After additional argument from defense counsel, the trial court denied Galbert's counsel's request.

The trial court also denied Galbert's request to instruct the jury on the standard of ordinary negligence under CACI No. 401. Instead, the court instructed the jury on the general elements of gross negligence under a modified version of CACI No. 400 and on the standard for gross negligence under CACI No. 425.

B.

Galbert argues that the trial court erred by repeatedly refusing to rule on the validity of the liability waiver, by construing his complaint as alleging only a cause of action for "gross negligence," and by denying him leave to amend the complaint to pursue a theory of ordinary negligence at trial.

Ordinary negligence "consists of a failure to exercise the degree of care in a given situation that a reasonable person under similar circumstances would employ to protect others from harm." (*Santa Barbara*, *supra*, 41 Cal.4th at pp. 753-754.) Gross negligence means "either a ' " 'want of even scant care' " ' or ' " 'an extreme departure from the ordinary standard of conduct.' " ' " (*Id.* at p. 754.) "Gross negligence is different from ordinary negligence in degree, not in kind." (*Epochal Enterprises, Inc. v. LF Encinitas Properties, LLC* (2024) 99 Cal.App.5th 44, 56.) "Because gross negligence is simply a

9

degree of negligence, the elements of a claim for gross negligence [are] the same as one for ordinary negligence": duty, breach, causation, and damages. (*Ibid.*; *Rosencrans v. Dover Images, Ltd.* (2011) 192 Cal.App.4th 1072, 1082.)

Appellate courts, including ours, have concluded that California does not recognize a separate cause of action for "gross negligence" independent of a statutory basis. (See, e.g., *Hass v. RhodyCo Productions* (2018) 26 Cal.App.5th 11, 32 [citing cases]; *Epochal Enterprises, Inc. v. LF Encinitas Properties, LLC*, *supra*, 99 Cal.App.5th at p. 55; *Jimenez v. 24 Hour Fitness USA, Inc.* (2015) 237 Cal.App.4th 546, 552 & fn. 3; *Saenz v. Whitewater Voyages, Inc.* (1990) 226 Cal.App.3d 758, 766, fn. 9.) Our Supreme Court likewise has not expressly recognized such a cause of action. (*Santa Barbara*, *supra*, 41 Cal.4th at pp. 779-780; see also *Hass*, at p. 32 [discussing *Santa Barbara*].) Even so, our Supreme Court has "emphasize[d] the importance of maintaining a distinction between ordinary and gross negligence," particularly in cases involving releases of liability for recreational activities, because such releases cannot, as a matter of public policy, release liability for future *gross* negligence, even while they are enforceable with respect to future *ordinary* negligence. (*Santa Barbara*, at pp. 750-751, 767; *Jimenez*, at p. 554 ["A release cannot absolve a party from liability for gross negligence"].) In a case where a liability waiver is found enforceable as to ordinary negligence, "a theory of gross negligence, if supported by evidence showing the existence of a triable issue, is the *only* negligence-based theory that is potentially open" to a plaintiff. (*Santa Barbara*, at p. 781.)

"A plaintiff is not required to anticipate [a release-of-liability] defense [citation]; instead, the defendant bears the burden of raising the defense and establishing the validity of a release as applied to the case at hand." (*Santa Barbara*, *supra*, 41 Cal.4th at p. 780, fn. 58.) A plaintiff need not expressly plead a theory of gross negligence to survive a defendant's assertion of a valid release-of-liability defense at summary judgment; but the complaint must allege *facts* sufficient to support a theory of gross negligence. (See

10

*Hass v. RhodyCo Productions*, *supra*, 26 Cal.App.5th at pp. 32-33 [error to refuse to consider claim of gross negligence for failure to plead it in complaint; noting that complaint set forth facts that "could be viewed as supporting a claim of gross negligence"]; *Eriksson v. Nunnink* (2011) 191 Cal.App.4th 826, 856, 857 [because complaint alleged facts that "could well equate to gross negligence," triable issues existed as to whether the defendant's "conduct was grossly negligent and therefore outside the scope of the release"].)

"Summary judgment proceedings usually are limited to the issues framed by the pleadings. [Citation.] However, courts are encouraged to take a liberal approach in determining the scope of the pleadings, so long as those pleadings provide adequate notice to the opposing party of the theories on which relief is generally being sought. [Citation.] 'The test is whether such a particular theory or defense is one that the opposing party could have reasonably anticipated would be pursued, and whether a request for leave to amend accordingly would likely have been granted.' " (*Jones v. Awad* (2019) 39 Cal.App.5th 1200, 1211.)

Galbert primarily contests the trial court's refusal to adjudicate the validity of the waiver at summary judgment based on the court's view that the operative complaint alleged only a cause of action for gross negligence. Galbert maintains that there is no such thing as a separate cause of action for "gross negligence" and, as a result, his use of the word "gross" in his complaint does not change the fact that the stated cause of action was always one for negligence. We review his claim of legal error de novo. (*Amdahl Corp. v. County of Santa Clara* (2004) 116 Cal.App.4th 604, 611.)

Even assuming there is no distinct cause of action for gross negligence as we have previously concluded (*Jimenez v. 24 Hour Fitness USA, Inc.*, *supra*, 237 Cal.App.4th at p. 552 & fn. 3), a plaintiff's pleading choices still matter. And in this case, it is evident from the way Galbert pleaded his negligence causes of action over the years that, from the start, he chose to proceed on a theory of gross negligence in anticipation of

11

defendants' assertion of the waiver as an affirmative defense. His original complaint asserted under a heading of "Gross Negligence" that "totally ignoring" the cited best practices guidelines "constitute[d] gross negligence" and that defendants "demonstrated [an] extreme departure from what a reasonably careful person would do in the same situation . . . , constituting gross negligence . . . ." (Some capitalization omitted.) It contained no allegation of negligence without the "gross" modifier. The record does not contain Galbert's first and second amended complaints, but it does disclose that both captioned the relevant cause of action as one for "Reckless and Gross Negligence [CACI 425]." (Original brackets.) The operative third amended complaint likewise labeled its sole cause of action as one for "Reckless/Gross Negligence (CACI 425)." (Some capitalization omitted.) By repeatedly invoking California Civil Jury Instruction No. 425 on " 'Gross Negligence,' " to the exclusion of other forms of negligence, the operative complaint effectively alleged, as stated in the text of that instruction, a "lack of any care or an extreme departure from what a reasonably careful person would do in the same situation." (CACI No. 425.)

This framing, moreover, was not limited to the labeling of the cause of action. (See *Ananda Church of Self-Realization v. Massachusetts Bay Ins. Co.* (2002) 95 Cal.App.4th 1273, 1281 ["The nature and character of a pleading is to be determined from the *facts alleged*, not the name given by the pleader to the cause of action"].) Galbert asserted twice in the substantive allegations that the facts "demonstrat[e] gross negligence as defined in California Civil Jury Instruction # 425" and "constitut[e] Gross Negligence (CACI 425)." Like the original complaint, the third amended complaint never uses the word "negligence" unaccompanied by the "gross" modifier. It alleges "extreme, outrageous, and utter disregard" and asserts throughout that defendants were grossly negligent.

Given the different rules that apply to cases involving waivers of liability for ordinary negligence versus gross negligence (*Santa Barbara*, *supra*, 41 Cal.4th at

12

pp. 750-751), we cannot discount the use of these words as mere rhetorical embellishment of a general negligence claim. (Compare *Lombera v. Union Paving Co.* (1934) 3 Cal.App.2d 269, 270-271 [in complaint alleging that vehicles were driven in " 'grossly, careless and negligent manner,' " characterization of negligence as " 'gross' " could be "disregarded as surplusage" without affecting sufficiency of complaint as stating cause of action for ordinary negligence].) Rather, they reflected a pleading confined to the sole negligence theory that could not be overcome by the waiver.

Further, the fact that defendants briefed the waiver's validity in their moving papers does not mean that the trial court had to resolve that issue; nor does it mean that defendants necessarily understood Galbert to be asserting a theory of ordinary negligence in addition to gross negligence, as Galbert contends. Given the context, defendants' discussion of the waiver in their summary judgment briefs appeared aimed at setting the table for why the issue on summary judgment was limited to gross negligence, as defendants argued expressly in their briefing papers.

Galbert argues that he should not have been penalized for alleging "more than what was ultimately required" and that "pleading and proving gross negligence in essence subsumes the 'lesser included' claim of ordinary negligence." While we recognize that a major departure from the standard of care may necessarily encompass a more moderate departure as well, in this case, for the reasons described above, the allegations contradicted such an inclusive reading of the operative complaint. The trial court did not err in holding Galbert to his pleading choice. And because it reasonably interpreted the operative complaint to assert only a theory of gross negligence, there was no need to adjudicate the validity of the waiver in ruling on defendants' motion for summary judgment.

Beyond challenging the trial court's decision not to resolve the validity of the waiver at summary judgment, Galbert challenges the denial of his subsequent motion to further amend his complaint to add what he called a "Second Cause of Action for

13

(ordinary) Negligence." We review the denial of leave to amend for abuse of discretion. (*Branick v. Downey Savings & Loan Assn.* (2006) 39 Cal.4th 235, 242; Code Civ. Proc., § 473, subd. (a)(1).) "Courts must apply a policy of liberality in permitting amendments at any stage of the proceeding, including during trial, when no prejudice to the opposing party is shown." (*P&D Consultants, Inc. v. City of Carlsbad* (2010) 190 Cal.App.4th 1332, 1345.) Prejudice arises when allowing an amendment would, for example, delay the trial, require further discovery, or change "the tenor and complexity of the complaint from its original focus." (*Magpali v. Farmers Group, Inc.* (1996) 48 Cal.App.4th 471, 486-488.) In addition, "a long unexcused delay is sufficient," standing alone, to uphold denial of amendment, "particularly where the new amendment would interject a new issue which requires further discovery." (*Green v. Rancho Santa Margarita Mortgage Co.* (1994) 28 Cal.App.4th 686, 692.)

The trial court did not abuse its discretion in denying leave to amend based on Galbert's unwarranted delay in seeking leave and the resultant prejudice to defendants. By the time Galbert moved to amend, it had been almost four years since he filed this suit, and trial was set to begin in two months. Indeed, the motion was noticed for hearing on April 15, 2022, after the deadline for filing motions in limine and only two court days before those in limine motions were to be heard. We see no valid excuse for Galbert's failure to seek amendment long before, and his motion offered none. Galbert's motion referenced the trial court's August 2021 summary judgment decision declining to rule on the waiver's validity, but even construing this as an asserted excuse for the delay, it still leaves unexplained the six months that he continued to wait after that decision issued. Since before filing suit, Galbert had been aware that he could proceed on an ordinary negligence theory, as demonstrated by his original and then amended government tort claims. Yet none of his complaints did so.

The trial court also acted within its discretion in finding that Galbert's proposed amendment would have prejudiced defendants. As the court explained in its order

14

denying the motion for a new trial, Galbert's motion to amend came "well after discovery had closed and important expert testimony deadlines had passed." Galbert argues that no further discovery would have been required because he was not seeking to add new facts to the complaint and that, in any event, defendants failed to specifically explain what prejudice they would suffer from amendment. But defendants argued in their written opposition that, among other forms of prejudice, they had already "spent significant time preparing for th[e] trial in reliance on the fact" that only gross negligence was at issue. And because Galbert failed to provide us with a reporter's transcript of the hearing on his motion to amend, we cannot know the full extent of the support for defendants' claim of prejudice that was presented to the trial court. Moreover, Galbert's proposal to press a new theory of negligence would have "opened up an entirely new field of inquiry without any satisfactory explanation as to why this major change in point of attack had not been made long before trial." (*Estate of Murphy* (1978) 82 Cal.App.3d 304, 311.) Because the trial court would have had to reopen discovery and delay trial further beyond the four prior continuances to avoid such prejudice, there was no abuse of discretion in denying leave to amend. (*Magpali v. Farmers Group, Inc.*, *supra*, 48 Cal.App.4th at pp. 486-488.)

Finally, Galbert briefly asserts that the trial court erred by refusing his request to instruct the jury, under CACI No. 401, on the basic standard of care for ordinary negligence. Parties are entitled to instruction on " ' " 'the law applicable to all their theories of the case' " ' " that are " ' " 'supported by the pleadings and the evidence.' " ' " (*Ayala v. Arroyo Vista Family Health Center* (2008) 160 Cal.App.4th 1350, 1358.) But as we have explained, ordinary negligence was not a theory supported by the operative complaint—or, indeed, any of the pleadings that preceded it. The trial court correctly denied Galbert's request to give CACI No. 401 and instead gave CACI No. 425, which defines gross negligence, the only theory of negligence asserted in the operative complaint.

15

## II.

Next, Galbert contends that the trial court erred by repeatedly instructing the jury that certain guidance and policy documents did not establish a "mandatory duty" or "mandatory standard of care."

## A.

At trial, Galbert introduced several guidance and policy documents as evidence of the standard of care that a reasonable football coach or high school administrator would have exercised. Among these documents were a series of sports medicine bulletins from the California Interscholastic Federation (CIF), of which Lincoln High School is a member; a National Federation of State High School Associations (NFHS) position statement on heat acclimatization and heat illness prevention; a journal article on best practices for preventing sudden death in school sports; the Lincoln High School Coaches Handbook; and a District Board Policy.

Defendants moved in limine to exclude all opinions, evidence, and arguments that the CIF bulletins and NFHS statement "imposed any mandatory duties or were rules, regulations, or bylaws." Defendants argued that these documents were not "enactments" and imposed no mandatory duties and that Galbert should therefore be precluded from arguing that they "outline a required course of conduct." Galbert filed opposing motions in limine to (1) exclude evidence or argument that defendants did *not* have to follow CIF policies, the NFHS statement, District policies, and the Coaches Handbook and (2) instruct the jury, pursuant to CACI No. 418 (presumption of negligence per se), that if a defendant violated any of the CIF bulletins in a way that contributed to his harm, then that defendant must be found negligent.

The trial court granted defendants' motion in limine and denied Galbert's corresponding motions. In its detailed minute order, the court ruled that the CIF bulletins, NFHS statement, and the Coaches Handbook "cannot be used to establish the duty of care." The court explained that, under Evidence Code section 669.1 and

governing case law, these documents could not be " 'viewed as establishing the applicable standard of care' " because none had been formally adopted as a statute, ordinance, or regulation; but they nonetheless "may be considered by the trier of fact in determining whether or not Defendants were negligent in a particular case." Thus, the court held that any expert testifying about these documents must address the breach of the legal duty of care, and not simply any breach of the guidance contained in the documents. The court specified that "[s]uch testimony may not be presented in such a way that the jury could conclude it was the violations of the CIF Handbook, CIF bulletins[,] the [NFHS] Position Statements[,] or the LUSD Coach's Handbook that were actionable, rather than the breach of the legal duty of care." At a hearing, the court explained that the policy documents were "admissible as evidence of the question of negligence[,] but they cannot be used to establish the standard of care."

At trial, the court reiterated that it was "not going to allow [Galbert] to use language from any of these documents to establish a mandatory duty yet at the same time [it would] allow expert testimony as to the relevant standard of care." The court specified that Galbert's experts could not use language like "must follow," or "must" or "shall," in describing the contents of the policy documents because the documents did not constitute "mandatory law. They are just guidelines." Allowing such language, the court reasoned, would invite "a back door[ ]way around the motion in limine that [it] issued."

On the fourth day of testimony, Galbert's heatstroke expert testified about the journal article on best practices for preventing sudden death in school sports. When Galbert's counsel began quoting portions of the article that referred to "policies, mandates and laws that have been created to enhance the health and safety" of athletes, the trial court gave the following special instruction: "So in California we have a provision of the Evidence Code. It's 669.1 and that provides that a rule, policy, manual or guidelines may not be properly viewed as establishing a mandatory duty or mandatory standard of care but they may be considered as evidence of negligence. Okay? [¶] And

17

essentially what that means is that you can't look at a guideline and say 'Violation of that guideline is a—creates either a mandatory duty, right, or a mandatory standard of care but you can consider standards or guidelines as one kind of evidence to help the Trier of Fact, that is you, determine the issue of reasonable care. [¶] So what that means is that when you have a guideline and hypothetically let's say you have a violation of that guideline, you cannot find that that conclusively determines the issue." At three subsequent points of his examination of this expert, Galbert's counsel quoted portions of the article that used the word "must," and on each occasion, the trial court gave an abbreviated version of the same special instruction that "Evidence Code [section] 669.1 provides that a rule, policy, manual or guideline may not properly be viewed as establishing a mandatory duty or a mandatory standard of care." Toward the end of the heatstroke expert's testimony, defense counsel stipulated to the admission of the NFHS statement if the court would give the same admonition. After Galbert's counsel stated he had no objection, the court gave another abbreviated Evidence Code section 669.1 instruction, substantively identical to the previous three.

A few days later, another of Galbert's experts testified regarding best practices for coaching and administration of high school sports. At two points when the coaching expert testified about displayed portions of the Lincoln High School Coaches Handbook, the trial court instructed the jury that, under Evidence Code section 669.1, "a rule, policy, manual or guideline may not properly be viewed as establishing a mandatory duty or mandatory standard of care, but they may be considered by a jury in determining whether a defendant was negligent in a particular case." Galbert's counsel had earlier agreed to the giving of this instruction with respect to the second portion of the Handbook.

One week later, during testimony from Galbert's high school administration expert about whether the District was required to follow CIF bylaws and rules in conducting its athletics programs, the trial court twice instructed the jury as it had for the coaching

18

expert. And after the close of evidence, as part of the final jury instructions, the court gave an instruction quoting Evidence Code section 669.1 verbatim.

B.

We review Galbert's claims of instructional error de novo. (*Ghezavat v. Harris* (2019) 40 Cal.App.5th 555, 558.)

Galbert argues, first, that it was error to give the Evidence Code section 669.1 special instructions because they were irrelevant and unnecessary since duty is a legal question to be decided by the court, not by the jury, and the trial court had already decided that defendants owed no mandatory duty. We disagree with this contention. In *Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703, 720, our Supreme Court explained the "appropriate role" that provisions of uncodified policy documents may play in a negligence action under California law. In cases, like this one, where the policy or guidance documents at issue have not been formally adopted "as a statute, as an ordinance of a local governmental entity in this state empowered to adopt ordinances, or as a regulation" by a state or federal agency pursuant to the applicable Administrative Procedure Act (Evid. Code, § 669.1), the documents "may not properly be viewed as *establishing* the applicable standard of care, but they may be *considered* by the trier of fact in determining whether or not [an individual] was negligent in a particular case" (*Lugtu*, at p. 720; see *id.* at pp. 720-721).

The trial court's instructions reasonably implemented that rule. Given that many of the policy documents on which Galbert relied contained mandatory language and were issued by entities that the jury might view as binding authorities—the District, the California Interscholastic Federation, and the National Federation of State High School Associations—the trial court was appropriately concerned with avoiding the possibility that the jury would view any violation (i.e., breach) of the guidance in those documents as necessarily establishing breach of a legal duty. Consistent with the line drawn in *Lugtu*, the trial court's admonitions to the jury permitted consideration of the policies as

19

evidence of negligence while clarifying for the jury that mandatory provisions of the documents did not necessarily set the standard of care by which to evaluate defendants' conduct. For that reason, we likewise reject Galbert's argument that the trial court misstated the law by instructing the jury in the first special instruction that if it found "a violation of [a] guideline, [it could ]not find that that *conclusively* determines the issue." (Italics added.) We do not read that instruction as a suggestion that Galbert had to conclusively establish negligence, as his brief suggests. Rather, the instruction was explaining the concept that the jury *could* consider a violation of a guideline as evidence of breach but that it did not *have* to view such a violation as a breach. (See *Lugtu v. California Highway Patrol*, *supra*, 26 Cal.4th at pp. 720-721 [while policy manual could not "be read to *establish* the standard of care," it could "be considered as evidence on the question of negligence"].)

Similarly, contrary to Galbert's view, the trial court's instructions did not unduly emphasize defendants' theory that they were not negligent for failing to follow the guidance documents. As explained, the court's initial statement of the special instruction advised that the policy and guidance documents "may be considered as evidence of negligence" and that the jury could consider those guidelines in determining whether defendants exercised reasonable care; it just could not find defendants *necessarily* negligent based on violating a guideline. Four out of the eight times the trial court subsequently gave an abbreviated version of the special instruction, it included the statement that policy guidelines "may be considered by a jury in determining whether a defendant was negligent in a particular case." While the first four abbreviated instructions lacked this statement, the initial full instruction during the same expert's testimony had already conveyed that concept. We likewise disagree with Galbert that the instructions were self-contradictory. They were drawing a nuanced distinction, reasonably necessitated by the "fine line" set by the case law, as the trial court observed from the outset of trial.

20

Finally, we reject Galbert's contention that, by repeating that the guidance documents were not "mandatory," the trial court effectively told the jury that defendants did not have to follow that guidance and therefore left jurors unable to determine the standard of care accepted by the coaching community. That conclusion does not follow from the premise. The very first special instruction stated that policy and guidance documents "may be considered as evidence of negligence." Further, the jury heard extensive testimony from each of Galbert's liability experts about what they considered the standard of care to be and how they viewed the conduct of the District and its employees as constituting an extreme departure from that standard. For instance, Galbert's heatstroke expert testified, without objection and with no special instruction, that the CIF heatstroke bulletins constituted the standard of care for preventing and treating heatstroke in California high school football. He further testified that, based on his journal article and one of the CIF bulletins, "the minimum standard would be [to] call 911 and cool the person." Galbert's coaching expert testified at length about all four of the CIF bulletins without any special instruction being requested or given. He also testified that it would "absolutely" be a "gross violation of the standard of care" to not follow the CIF bulletins. And Galbert's high school administration expert testified, without interruption, that the District "should have" followed the measures described in one of the CIF bulletins and that the failure to follow the policies of the CIF bulletins by the District superintendent, high school principal, and high school athletic director constituted "an extreme departure" from what a reasonably careful person would do. This testimony, in addition to the policy documents the jury was expressly told it could consider as evidence of negligence, despite their nonbinding nature, allowed Galbert to present his theory of defendants' breach.

In his reply brief, Galbert additionally argues that it was error to instruct the jury with the full text of Evidence Code section 669.1 in the closing instructions. This

21

contention is forfeited for failure to raise it in the opening brief.  (*People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9.)

Given the potential for the jury to mistake a violation of the terms of the policy documents as necessarily establishing defendants' liability, the trial court did not err in explaining their permissible role to the jury.

III.

Galbert additionally contends that the trial court erred in sustaining a subpoenaed witness's numerous assertions of unadorned "privilege" and by instructing the jury in a way that implied that the witness was claiming the attorney-client privilege when in fact he was claiming the Fifth Amendment privilege against self-incrimination.

A.

Among the many individuals deposed during pretrial proceedings was an individual who had served as the athletic director of Lincoln High School from 2014 through 2018.  Galbert later subpoenaed the athletic director to testify at trial, but the athletic director appeared on the appointed date with a separately retained attorney who informed counsel outside of the jury's presence that, when called, his client would be exercising his Fifth Amendment rights.  At the athletic director's request, the trial court held an in camera hearing to decide the propriety of his invocation of the privilege.  (See *People v. Doolin* (2009) 45 Cal.4th 390, 442.)  Only the athletic director, his personal counsel, the court reporter, and the trial judge were present, and the reporter's transcript of the in camera hearing was ordered sealed.[4]  Back in open court, the trial court ruled that the athletic director had "a valid claim to the 5th Amendment privilege with respect to some questions," and it laid out several options for how to proceed.  (See *Fuller v. Superior Court* (2001) 87 Cal.App.4th 299, 307-308 [discussing options to accommodate

---

[4]  After the filing of Galbert's opening brief, we denied Galbert's opposed motion to view the sealed transcript of the in camera hearing.

22

competing interests in cases of Fifth Amendment privilege].)  After ruling out a stay of the litigation, the trial court proposed issuing a protective order to confer use immunity on the athletic director, pursuant to the procedure laid out in *Blackburn v. Superior Court* (1993) 21 Cal.App.4th 414, 432.  The court ordered the San Joaquin County District Attorney to show cause why such a protective order should not issue.  Galbert's counsel separately wrote to the district attorney to request that she not extend use immunity.  The district attorney objected to the court's proposed grant of use immunity, and the trial court concluded that the objection precluded that option.  (*Philibosian v. Superior Court* (1983) 149 Cal.App.3d 938, 941.)

Accordingly, after discussion with counsel for the parties and the athletic director, the trial court decided on a procedure under which the athletic director would take the stand and his counsel could assert a generic "privilege" objection as he felt appropriate, and the court would understand it as an invocation of the Fifth Amendment privilege without revealing to the jury the precise nature of the objection.  For sustained objections, the court would find the athletic director unavailable to testify and permit Galbert's counsel to read in the director's prior deposition testimony on the topic.

The trial court asked whether any party was requesting an instruction under "CACI 215 and/or CACI 216," in connection with the contemplated exercise of the privilege.  Galbert's counsel answered:  "[W]e would request it so that the record is clear they don't want it" and because "the jury should hear why he's unavailable."  Defense counsel and counsel for the athletic director requested CACI No. 215 (exercise of communication privilege) but not CACI No. 216 (exercise of right not to incriminate oneself).  Observing that CACI No. 216 states that its intended use is in circumstances where the Fifth Amendment issue is raised in the presence of the jury, the court reserved decision on whether to give that instruction.

During the athletic director's testimony, the trial court ruled on roughly 100 objections by his counsel on grounds of "privilege."  When the court first sustained

one of these privilege objections, it instructed the jury under CACI No. 215 that the athletic director had "an absolute right not to disclose what he told his attorney in confidence because the law considers this information privileged. [¶] Do not consider for any reason at all the fact that [the director] did not disclose what he told his attorney[. D]o not discuss that fact during your deliberations or let it influence your decision in any way." The court repeated substantially the same version of CACI No. 215 when instructing the jury after the close of evidence and again when Galbert's counsel discussed the athletic director's testimony during closing argument.

B.

Galbert's principal contention related to the privilege issue is that the trial court incorrectly sustained the athletic director's repeated Fifth Amendment privilege objections. Galbert does not present any arguments challenging the procedure the trial court adopted to allow the athletic director to testify, while also asserting the privilege in response to certain lines of examination without identifying the applicable privilege. We therefore do not address the correctness of that procedure.

Because the relevant facts are undisputed, we review independently the trial court's rulings permitting the athletic director to assert the privilege. (*People v. Seijas* (2005) 36 Cal.4th 291, 304.) "On review of a witness's successfully invoking the Fifth Amendment privilege, we look only to see whether it is evident from the 'implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result.' " (*People v. Capers* (2019) 7 Cal.5th 989, 1011, quoting *Hoffman v. United States* (1951) 341 U.S. 479, 486-487; see also Evid. Code, §§ 404, 940.)

First, Galbert argues that the trial court incorrectly sustained certain of the athletic director's privilege objections because it ruled inconsistently on three sets of similar questions posed during his examination. To the extent these rulings were inconsistent,

we see no resulting prejudice because, for each set of questions Galbert identifies, the trial court overruled the privilege objection on one occasion and the athletic director answered the question.

Next, Galbert argues that the trial court erred by sustaining privilege objections when the questions related to the conduct of another person or to conduct of the District. As Galbert observes, the "privilege against self-incrimination is personal to the person who invokes it" (*People v. Wisely* (1990) 224 Cal.App.3d 939, 944) and "cannot be utilized by or on behalf of any organization, such as a corporation" (*United States v. White* (1944) 322 U.S. 694, 699).  But the handful of questions he identifies as objectionable on these grounds *were* questions about subjects personal to the athletic director.  Galbert's counsel's question about whether "anybody" at the school "ever receive[d]" bulletins like the one being shown necessarily included the question of whether the athletic director himself received such bulletins.  The questions asking, "[w]ere you aware" of any CIF guidelines or policies that the school or the District did not follow also necessarily asked about the athletic director's personal knowledge.  And the same is true of the question asking, "did you have an understanding . . . that Lincoln High School was to follow the [CIF] sports medicine bulletins?"

Galbert additionally argues that it is not evident how answering certain types of questions potentially incriminated the athletic director and that the trial court's rulings prejudicially removed from the jury's consideration evidence of the athletic director's knowledge of heatstroke prevention and treatment protocols before the incident.  He asks us to review the transcript of the sealed proceeding to determine whether the athletic director had a valid basis for asserting his right against self-incrimination.  Having done so, we are satisfied that the trial court committed no error in allowing the athletic director to invoke his Fifth Amendment rights.

By our count, the trial court overruled nearly half of the roughly 100 "privilege" objections asserted by the athletic director, in an effort to allow testimony that fell outside

25

of the scope of the privilege. While we recognize Galbert's argument that the court's sustaining of the remaining objections disadvantaged his presentation of his case, our review of the record reveals no prejudicial error in the trial court's decisions on which privilege objections to sustain. Further, we reject Galbert's argument that the sustained privilege objections compounded the purported error of giving the special instructions on the absence of a "mandatory duty." As we have explained, the trial court did not err in either respect.

Apart from the trial court's rulings on the privilege objections, Galbert contends that it was error to instruct the jury with CACI No. 215 because doing so misled jurors into believing that the athletic director was asserting the attorney-client privilege and that Galbert's counsel was improperly attempting to invade that confidential relationship with his questioning. The record shows that the trial court was guided by instructions from the California Judges Benchbook in deciding how to instruct the jury regarding the athletic director's exercise of the privilege against self-incrimination. Regarding the drawing of an adverse inference from the invocation of the Fifth Amendment privilege, the relevant section of the Benchbook cited by the trial court states: "On the request of a party who may be adversely affected by an unfavorable inference that may be drawn by the jurors from the exercise of the privilege, the judge must instruct the jurors that no presumption arises because of the exercise of the privilege, and that they may not draw any inference from the exercise of the privilege. [Citations.] The judge should give CACI 215 (Exercise of a Communication Privilege) and 216 (Exercise of Right Not to Incriminate Oneself) for this purpose. [¶] Although [Evidence Code section] 913 does not state when a judge must give the mandated instruction, 'it is the far better practice to give it when privilege questions arise during the evidentiary phase of the trial as well as with the other instructions after the evidence has been presented.' " (California Judges Benchbook: Civil Proceedings–Trial (CJER 2024) § 8.34, p. 440.)

26

With respect to assertions of privilege in general, Evidence Code section 913, subdivision (b) "provides that the court, on a party's request, is to instruct the jury not to make any inference from the witness's exercise of a privilege." (*People v. Holloway* (2004) 33 Cal.4th 96, 130; see *People v. Doolin*, *supra*, 45 Cal.4th at p. 442.) "Evidence Code section 913 applies equally in civil litigation as in criminal prosecutions." (*Holloway*, at p. 130; see *id.* at p. 131 [California law "makes no distinction between civil and criminal litigation concerning adverse inferences from a witness's invocation of the privilege against self-incrimination"].) Given that defendants (and the athletic director's counsel) requested CACI No. 215 and Galbert requested CACI No. 216, it was incumbent upon the trial court to instruct the jury, in some form, not to draw any inference from the athletic director's exercise of a privilege. (*Holloway*, at p. 130; Evid. Code, § 913, subd. (b).)[5]

With respect to the particular instruction given here, we assume without deciding that it was erroneous. As noted, the trial court informed the jury that the athletic director had an absolute right not to disclose attorney-client communications, but his testimony did not involve that privilege. Still, the record provides no basis for us to conclude that any error prejudiced Galbert's case. In particular, we find no record support for Galbert's argument that the jury drew from the CACI No. 215 instructions a negative inference that his counsel was acting improperly by attempting to invade the attorney-client confidential relationship. As Galbert puts it elsewhere in his briefing, "nothing in the way Plaintiff's counsel phrased his question[s] implied that he was seeking information about a

---

[5] It is not entirely clear from the transcript exactly which of these instructions Galbert's counsel requested, given that the trial court asked about "CACI 215 and/or CACI 216," and counsel answered that he would request "it." During the same colloquy, however, Galbert's counsel argued that "the jury should hear why he's unavailable," referring to the athletic director. As the desire to avoid self-incrimination was the reason that the athletic director was partially unavailable, we construe Galbert's request as one for CACI No. 216, not CACI No. 215.

27

communication [the athletic director] made with his attorney." The initial question that prompted the special instruction was: "And did you fulfill that responsibility [to ensure student safety] regarding your supervision as it relates to [the freshman football coach]?" Neither this question nor any of the subsequent questions to which privilege objections were sustained implied or suggested a communication between the athletic director and his attorney. With nothing more than speculation that the jury harbored some form of retaliatory bias against Galbert's counsel based on his line of questioning, we conclude that any error in giving CACI No. 215 does not warrant reversal in this case.

IV.

As his final independent contention of error, Galbert argues that the trial court abused its discretion by not excluding statements that methamphetamine was in his system on the date of the incident when it undisputedly was not.

A.

Galbert was taking Adderall leading up to and on the day of the tryouts. The undisputed expert testimony at trial was that Adderall is an amphetamine; it does not contain methamphetamine. Nevertheless, the doctors who treated Galbert at the hospital believed, based on a urine test, that Galbert had some type of methamphetamine in his system. As Galbert's expert toxicologist explained at trial, the hospital's urine test yielded a positive result for amphetamine, which was expected because of his Adderall intake; but the type of testing performed did not distinguish between methamphetamine and amphetamine. In the toxicologist's opinion, the hospital notation that Galbert was positive for amphetamine and methamphetamine was made in error.

In a pretrial deposition, one of Galbert's treating hospital physicians, Dr. James Saxton, described the test results and opinions contained in Galbert's medical records. The excerpts of the deposition transcript contained in the record reflect numerous references to methamphetamine by Dr. Saxton or counsel, including two references to Galbert's "use" of methamphetamine.

28

Before trial, Galbert moved in limine to exclude any mention of Dr. Saxton's testimony that "Adderall, methamphetamine, [or] amphetamine" was a cause of Galbert's heatstroke. (Boldface omitted.) Defendants moved in limine to exclude any evidence or argument that they had ever claimed that Galbert was taking "street methamphetamines" before his injury, noting that they had only ever argued—and would only argue at trial—that Galbert's injuries were caused by his amphetamine medication Adderall. In response to defendants' motion, Galbert agreed that the term "street meth" should be excluded; he further argued that the court should also exclude all references to "meth" as prejudicial under Evidence Code section 352. At the motions in limine hearing, defense counsel conceded that, during the Saxton deposition, both he and Dr. Saxton referred to amphetamines and methamphetamines interchangeably. The trial court denied both parties' motions in limine without explanation.

Around the same time, defendants filed notices of intent to offer at trial portions of various video-recorded depositions, including Dr. Saxton's, attaching the relevant excerpts of the depositions.

Toward the end of trial and during their presentation of their case, defendants played portions of Dr. Saxton's deposition testimony. The trial transcript does not state which portions of the deposition were played. After the jury adjourned, Galbert's counsel objected that, by playing the portions of Dr. Saxton's deposition, defense counsel had "injected into the record several times the accusation that [Galbert] was on methamphetamine," and Dr. Saxton had testified that this could be a cause of Galbert's injuries. At Galbert's counsel's request, the trial court agreed to give a clarifying instruction to the jury.

On the next court day, the trial court informed the jury that it was giving a special instruction regarding Dr. Saxton's testimony, stating: "Both parties have agreed that there was only amphetamine in Jayden Galbert's body, not methamphetamine, from taking the prescribed dosage of Adderall. You are instructed to disregard all testimony

29

using the language methamphetamine. There was no evidence that Jayden Galbert had methamphetamine in his system." Galbert's counsel did not object to the instructional language but noted that it still would not "correct the problem."

Defendants then called their expert pharmacologist as a witness. After the pharmacologist was excused, the trial court asked if defense counsel wanted to finish presenting certain portions of video evidence. Defense counsel said he would, but advised the court that one of the remaining clips contained another mention of methamphetamine. Accordingly, before the video was played, the trial court repeated substantially the same admonition for the jury to disregard reference to methamphetamine, adding an explanation that "methamphetamine and amphetamine were used interchangeably."

In closing arguments, defense counsel emphasized Galbert's resumption of taking amphetamines in the form of his Adderall medication shortly before the tryouts. At one point, defense counsel stated: "So here he was three days into starting a new metham- – I'm sorry – a new amphetamine medication which was – he was simply not used to taking."

B.

Galbert argues that the trial court abused its discretion by denying the motions in limine that would have excluded argument or evidence about methamphetamine being in his system. In his view, the curative admonition regarding Dr. Saxton's deposition testimony played at trial was "too little too late."

Defendants first argue that Galbert has forfeited this argument by failing to provide a transcript of the portions of Dr. Saxton's deposition testimony played at trial. It is true that the trial transcript does not include a verbatim recitation of the deposition excerpts played. The record does contain, however, the trial court's quotation of, and citation to, several portions of the Saxton deposition transcript that were played and that the court found "could be confused" by the jury: Dr. Saxton's stated agreement with a

medical notation that Galbert was " '[n]ow confirmed to have methamphetamines on GU urine, likely contributing to acute organ injury and recent presentation,' " his stated agreement with another notation that " '[u]se of methamphetamine [was a] likely contributing factor to acute decompensation as urine GC positive,' " and his stated agreement that Galbert's "issues were because of, at least in part, methamphetamine."  It also appears from the deposition transcript that the jury heard an antecedent question and answer regarding another medical notation reflecting that Galbert's elevated levels were " 'likely secondary to [meaning because of] heat stroke and methamphetamine use.' "  Thus, we can evaluate the prejudicial effect of these references to methamphetamine affirmatively disclosed by the record.

Even assuming it was an abuse of discretion to not preclude any reference to methamphetamine before trial, the trial court's repeated admonition to the jury cured any prejudice.  In clear, direct language, the court admonished the jury that it was to "disregard all testimony using the language methamphetamine," that "there was only amphetamine in Jayden Galbert's body, not methamphetamine," and that "[t]here was no evidence that [he] had methamphetamine in his system."  "Absent some contrary indication in the record, we presume the jury follows its instructions [citations] 'and that its verdict reflects the legal limitations those instructions imposed' [citation]."  (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 803-804.)  Galbert offers no contrary record indication.

This was also not a case of trying to "unring a bell," as Galbert contends.  Before Dr. Saxton's testimony, the jury heard only evidence that Galbert had *not* taken any substance containing methamphetamine and did *not* have methamphetamine in his system, despite hospital records suggesting the opposite.  Before hearing Dr. Saxton's testimony about the medical notes referencing methamphetamine, the jury also specifically heard from Galbert's toxicology expert that the hospital staff "made an error" in referring to methamphetamine in the medical notes and that there was "[n]o validity"

to the statements that methamphetamine was in his urine. Combined with the overall clarity of the record that Galbert was taking Adderall, an amphetamine, and the trial court's straightforward directive that there was no evidence of methamphetamine in his system, we conclude that there was no prejudice from the references to methamphetamine in the portions of Dr. Saxton's deposition that the record shows were played for the jury. Our view is unchanged by Galbert's passing reference to defense counsel's mention of "metham- " before catching and correcting himself at closing argument. Again, we presume the jury heeded the court's instruction that there was no methamphetamine in Galbert's system, and counsel's arguments are, in any event, not evidence.

## V.

As we have found no error or prejudice in Galbert's individual claims, his cumulative error claim necessarily fails as well. (*People v. Gonzalez* (2021) 12 Cal.5th 367, 417; *Johnson v. Tosco Corp.* (1991) 1 Cal.App.4th 123, 141.)

## DISPOSITION

The judgment is affirmed. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

/s/
FEINBERG, J.

We concur:

/s/
ROBIE, Acting P. J.

/s/
MESIWALA, J.

32